GLICKSTEIN, Judge,
concurring specially.
Appellant was charged by information with trafficking in cocaine. His motion to suppress physical evidence was denied; and he was tried by jury, found guilty of trafficking in cocaine, was sentenced to a mandatory minimum term of fifteen years, and ordered to pay a fine of $250,000. In this appeal, appellant raises two issues. The first, in which he claims that the trial court erred in denying his motion to suppress physical evidence, I regard as worthy of discussion. The second is clearly without merit, because of State v. Yu, 400 So.2d 762 (Fla.1981) and Velunza v. State, 504 So.2d 780 (Fla. 3d DCA 1987).
Appellant arrived at the Fort Lauder-dale/Hollywood International Airport on June 25, 1985, and was greeted in the concourse by an acquaintance named Willie. According to appellant, Willie asked him to do him a favor by getting a package through the airport security system. Appellant agreed to do so based on Willie’s offer of $500 for carrying the package through the security checkpoint position at the beginning of each of the airport concourses and testified at trial that he did not know what was contained in the packages.
Appellant placed the package in question underneath a sports jacket on his back; walked through the metal detector at the USAir concourse when the metal detector alarm rang; and was asked to walk through the detector several additional times, whereupon airport security was called. He was asked to step back so that he could be patted down. On the pat down, a hard box type of object was felt on his back. His jacket was removed, and the box then became visible. It was taped to his clothing. At that time, two officers from the Broward Sheriff’s department, who responded to the alarm by airport security, asked appellant to go downstairs to the small office used by the Broward County Deputy Sheriff’s officers assigned to work at the airport. Appellant did not at any time say that he did not want to go with the police; and he was not placed under arrest at that time, or handcuffed or otherwise held. However, the officers did take his plane ticket, so that he was not free to leave to embark on his plane.
According to the testimony of Deputy Caravello, a law enforcement officer with over nine years’ experience, the package found in the back of appellant’s pants appeared to contain narcotics. The package was concealed by a wrapping of tape. Officer Caravello slit the package with a knife after fellow Officer Oliveri removed it from appellant’s back. Approximately one inch was cut in the package, and a white powdery substance was found inside. Officer Caravello testified that the substance felt like cocaine. Appellant did not state that he did not want the package opened or removed from his person. A field test confirmed positive for cocaine, whereupon appellant was given his Miranda rights and arrested. No search warrant to open the package was obtained. Also, at all material times, the officers held appellant’s ticket but did not tell him that he was under arrest or that he was free to go. A micro-crystalline test and gas chromatography mass spectrometer test were performed on the confiscated substance, and in the opinion of forensic chemist Robert Harrison, the substance was found to contain cocaine.
Appellant’s motion to suppress physical evidence alleged that the search was not incident to a lawful arrest, that the officers were not in possession of a search warrant, that the defendant did not give verbal consent to the search, and that there were no other exigent circumstances to prevent the *658 officers from being required to first secure a search warrant or valid consent. Also, appellant alleged that once the package was seized, and under the complete control of the officers, there were no exigent circumstances necessitating its search without a warrant. Appellant alleged lack of probable cause for the stop and search. The trial court, in denying defendant’s motion to suppress physical evidence, specifically finding that the stop and detention of the appellant were lawful; and that the law enforcement officers had a right to open and inspect the contents of the closed container that had been seized from defendant’s person.
The State relied essentially in this case on the split decision of this court in Captan v. State, 515 So.2d 1362 (Fla. 4th DCA 1987), which was reversed by the Supreme Court of Florida, 531 So.2d 88 (Fla.1988) after the state’s brief had been filed. At oral argument, counsel mentioned that the state was seeking further review of Ca-ptan in the United States Supreme Court. Regardless, I find support for the State’s position in Savoie v. State, 422 So.2d 308 (Fla.1982), although I believe it unfortunate that an automobile case was found there to be controlling. These search and seizure cases are made more difficult for me by our applying dissimilar factual situations to the same principle. When defendants in airport search cases are stopped or arrested, the exigency mentioned historically in automobile cases is lacking. Nevertheless, Savoie makes clear that a package carried by the defendant at the time of actual arrest, if the arrest is legal, may be opened without a warrant. It is not material whether the arrest occurs just before or just after the search of the package.
The reader may wish to review the photographic essay, “COCA, An Ancient Indian Herb Turns Deadly,” National Geographic, January 1989, for an examination of the historical and present marketing and use of cocaine — and the attendant corruption of public officials. It quotes Robin Williams’ wry observation as to its use, “It makes you paranoid and impotent — give me more of that!”
A simultaneous reading of the above article and of the 60’s skewed policies described in David Halberstam’s The Best and the Brightest (1972), leaves one wondering what our federal government’s real intent or interest is, with respect to this drug, vis a vis the countries of South America.
The January 30 — February 5, 1989, issue of The Washington Post National Weekly Edition’s article, Colombia’s Emerging Drug State, suggests:
For U.S. officials fighting the war on drugs, Colombia’s growing sense of impotence is jarring and ominous. The two principal trafficking cartels that operate here — one based in the city of Medellin, the other in Cali — are vertically integrated conglomerates that U.S. authorities say control about 80 percent of all the cocaine smuggled into the United States every year.
In the past, U.S. officials have talked about smashing the cartels, arresting their leaders and extraditing them to the United States to stand trial. Today, a new, sobering tone prevails: Officials talk privately about “holding the line” until drug consumption in the United States falls.
A U.S. official here says flatly: “The war on drugs is not going to be won on the enforcement battlefield. Our mission here is one of buying time.”
“If we believe that we can turn this around in a couple of years, then we have a total misconception of what we’re doing here,” says U.S. Ambassador Thomas McNamara. “This is a long struggle.”
In developing their global business, the Colombian trafficking families have shown a propensity for violence that U.S. officials say may be unprecedented in the annals of world crime: In the past four years, they have killed an attorney general, a minister of justice, more than 50 judges, more than 2 dozen journalists and more than 300 police and military personnel. Virtually every official here who speaks out against the traffickers *659 receives death threats — and winds up on a death list.
Bruce Bagley, a Colombia scholar at the University of Miami, estimated in a recent article in the journal Foreign Affairs that total drug trafficker revenues range between $2 billion and $4 billion a year, with about $2.5 billion to $3 billion repatriated to Colombia. That means cocaine has outstripped coffee as Colombia’s largest foreign exchange earner.”
Colombian officials are unanimous in arguing that the drug traffickers invest the bulk of their profits outside Colombia and that well under $1 billion a year flows back into the country.
Nevertheless, officials here acknowledge that in the past few years, cartel traffickers have channeled vast profits into stable investments in the mainstream economy.
“It is very difficult to find a person who does not want to do business with the traffickers, given that they pay well, pay in cash and don’t ask for discounts,” says Carlos Eduardo Lozano, a chief prosecutor for the judicial police.)
Id. at 11-12.
As a judge, I see Florida law enforcement officers being told to eradicate straggling ants by hitting them with a shoe while minimal funds are made available to get to the heart of the epidemic, and educational programs like DARE (Drug Awareness Resistance Education) go begging for financial support.
The present decision checks one ant. Meanwhile, looking at the Geographic’s map of The Cocaine Empire, at pages 24-25 of the issue cited, one sees innumerable ants pouring out of Peru, Ecuador, Colombia, Venezuela, Guyana, Brazil and Argentina to the U.S., Europe and Canada. Moreover, a recent Rand Corporation study suggests increased interdiction efforts are not likely to have significant impact on the quantity of drugs smuggled into the country.
The nation has recently sought to deal with adults using cocaine by the enactment of the Drug-Free Workplace Act of 1988, which law enforcement officers hail for the assistance it will give them. I would remind the reader of the sentiment which Dr. C. Henry Kempe, who announced in 1962 the existence of the battered child syndrome, had carved on a log which hangs over the fireplace in the Kempe Center:
It is easier to build children than to repair men.
Surely, our children can be taught to keep away from the ants, if the necessary funds are provided to educators and law enforcement officers, as the straggling ants continue to get nabbed in South Florida’s airports, train platforms and bus stations.
Responsive Florida counties, finally following the lead of Pinellas after forty years and utilizing the provisions of section 125.901, Florida Statutes (Supp.1986), are creating Children’s Services Councils to provide local funds through ad valorem taxation for substance abuse prevention programs. Responsible state legislators who take seriously the statistics and findings provided by the Florida Center for Children and Youth would realistically vote meaningful funds for prevention programs —giving real service, rather than lip service, to this problem.